CASE NO. 13-56132

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JOHNNY BACA,

  Petitioner and Appellant,

v.

DERRAL ADAMS, Warden,

  Respondent and Appellee.

CASE NO.13-56132

DISTRICT COURT NO.
5:08-CV-00683-MMM-
PJW

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

(HONORABLE MARGARET M. MORROW, JUDGE)

APPELLANT'S OPENING BRIEF

Patrick J. Hennessey, Jr.
Attorney At Law (047993)
2356 Moore Street, Suite 201
San Diego, CA 92110
(619) 298-7802
pjhjr@hotmail.com
Attorney for Appellant

TABLE OF CONTENTS

INTRODUCTION...........................................1

FEDERAL COURT PROCEEDINGS..............................4

JURISDICTION...........................................6

I......................................................7

STATEMENT OF THE CASE..................................7

    1. California Procedural History..................7

    2. Federal Court Proceedings......................8

II.....................................................9

STATEMENT OF FACTS.....................................9

ARGUMENT I............................................18

   APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
   COUNSEL WHEN COUNSEL FAILED TO OBTAIN AND USE THE
   TRANSCRIPT OF THE INFORMANT'S SENTENCING HEARING TO
   IMPEACH THAT INFORMANT AND A DEPUTY DISTRICT ATTORNEY
   WHO TESTIFIED IN SUPPORT OF THE INFORMANT THAT NO
   MATERIAL BENEFIT HAD BEEN RECEIED BY INFORMANT IN
   EXCHANGE FOR HIS TESTIMONY AGAINST APPELLANT BACA....18

    A. Factual Background.............................18

    B. Appellant's Argument in the District Court......20

    C. Decision of the District Court.................21

    D. Discussion....................................23

ARGUMENT II...........................................32

   THE PROSECUTION COMMITTED MISCONDUCT BY PRESENTING
   FALSE EVIDENCE THAT THE INFORMANT HAD NEITHER ASKED FOR
   NOR RECEIVED ANY BENEFIT FOR TESTIFYING AGAINST
   APPELLANT.........................................32

    A. Introduction..................................32

    B. District Court's Findings and Recommendations...32

    C. Discussion....................................33

CONCLUSION/STATEMENT OF RELATED CASES............. 38, 39

CERTIFICATION OF WORD COUNT . . . . . . . . . . . .. 40

i

CERTIFICATE OF MAILING. . .... . . . . . . . . . . ..41

TABLE OF AUTHORITIES

## Cases

*Cone v. Bell* (2009) 129 S.Ct. 1769, 1786 .............. 29

*Detrich v. Ryan* (9th Cir. 2012) 677 F.3d 958 .......... 26

*George v. Camacho* (9th Cir. 1997) 119 F.3d 1393 ....... 34

*Giglio v. United States* (1972) 405 U.S. 150, 154-155 .. 33, 35

*Harrington v. Richter* (2011) 131 S.Ct. 770, 786 ....... 23

*Jackson v. Brown* (9th Cir. 2008) 513 F.3d 1057, 1075 ... 36

*Libberton v. Ryan* (9th Cir. 2009) 583 F.3d 1147, 1164, *cert. denied*, 130 S.Ct. 3412 (2010) .................. 35

*Mitchell v. Esparza* (2003) 540 U.S. 12, 18 ............. 23

*Napue v. Illinois* (1959) 360 U.S. 264, 269 ............. 33

*Northern Mariana Islands v. Mendiola* (9th Cir. 1992) 976 F.2d 975, 486 ....................................... 34

*Panetti v. Quarterman* (2007) 551 U.S. 930, 953 ........ 25

*People v. Baca* (Sept. 28, 1999, E021093) [nonpub. opn]. 12

*Richter* 131 S.Ct. at pp. 786, 792 ..................... 23

*Richter*, *supra*, 131 S.Ct. at p. 786 .................. 26

*Strickland v. Washington* (1984) 466 U.S. 668 .......... 22

*Stricklar v. Green* (1999) 527 U.S. 263, 281 ........... 34

*Terry Williams v. Taylor*, *supra,* 529 U.S. at pp. 409-410 .................................................. 25

*United States v. Augers* (1976) 427 U.S. 97, 103 ....... 33

*United States v. Augers, supra*, at p. 103 ............. 34

*United States v. Wallach* (2d Cir. 1991) 935 F.2d 445, 456 .................................................. 35

iii

*Williams v. Taylor* (2000) 529 U.S. 362, 405-406........24

**Statutes**

28 U.S.C. section 2253...................................6

28 U.S.C. section 2254(d)..............................24

28 USC section 2254...............................4, 24

Penal Code section 187 and 189.........................2

Section 2254(d)........................................26

Section 2254(d)(1)....................................24

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHNNY BACA,<br><br>  Petitioner and Appellant,<br><br>v.<br><br>DERRAL ADAMS, Warden,<br><br>  Respondent and Appellee. | CASE NO.13-56132<br><br>DISTRICT COURT NO.<br>5:08-CV-00683-MMM-<br>PJW |

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

(HONORABLE MARGARET M. MORROW, JUDGE)

APPELLANT'S OPENING BRIEF

<u>INTRODUCTION</u>

Appellant Johnny Baca stands convicted of two counts
of first-degree murder following two trials in the
Riverside County, California Superior Court.  Appellant's
original 1997 conviction was reversed on appeal by the
California Court of Appeal, Fourth Appellate District,
Division Two.  This conviction was reversed based upon

1

the Court's finding defense counsel was ineffective in questioning appellant about prior arrests that opened the door for questions about his arrest for the rape of a seven-year-old girl. (ER1 pp. 7-8.)

Appellant was retried and again found guilty of two counts of first-degree murder. The jury made a specific finding the homicides were premeditated and deliberate within the meaning of California Penal Code sections 187 and 189. He is currently serving a term of 70 years to life in prison. Baca appealed to the California Court of Appeal and that Court affirmed the convictions. His petition for review was denied by the California Supreme Court. (ER1 p. 8.)

In his second trial, as in the first, a jailhouse informant, Daniel Melendez, provided testimony relative to an alleged confession by appellant that he committed the murders and that the murders were committed at the behest of one of the victim's stepsons to collect on the victim's estate. At the second trial, Melendez again denied asking for or receiving any benefit for his testimony against Baca and that the sentence reduction he received was the result of unrelated information he had provided law enforcement officials.

2

Riverside County Deputy District Attorney Robert
Spira testified before the jury and vouched for Melendez
to the extent that Melendez did not ask for or receive
any benefit for his testimony against Baca. Spira stated
that a multi-year reduction Melendez received was the
result of changes in California law rather than a benefit
given to Melendez for his testimony in Baca's trial.

Apparently not known by defense counsel at the
second trial, the transcript of the sentencing hearing in
the Melendez case indicates that both Melendez and Deputy
District Attorney Spira testified falsely before the jury
at appellant's trial as to benefits given to Melendez.
The transcript makes it clear and both the California
Court of Appeal and the United States District Court
found that both Melendez and Spira had testified falsely
as Melendez did in fact receive a sentence reduction for
his testimony. Defense counsel, apparently unaware of
the existence of the transcript, did not review a copy or
use it to impeach either Melendez or Spira.

In the District Court appellant challenged his
conviction on the ground that his trial counsel was duty
bound to obtain a copy of the Melendez sentencing
transcript and that failure to do so, combined the total

3

failure to cross-examine either Melendez or Deputy District Attorney Spira as to the contents of that transcript constituted ineffective assistance of counsel.

Appellant further alleged in the District Court that the prosecutor's office was guilty of gross misconduct in soliciting and presenting to the jury false testimony regarding benefits extended to the jailhouse informant, Melendez. These issues and the conduct of the prosecutor in appellant's case are of such a nature as to establish prejudice, contrary to the finding of the District Court, and warrant reversal of appellant's State court convictions.

## FEDERAL COURT PROCEEDINGS

On May 16, 2008, appellant filed a Petition for Writ of Habeas Corpus in the United Stated District Court for the Central District of California pursuant to 28 U.S.C. section 2254, raising three issues:

1. Defense counsel was ineffective for failing to obtain the transcript of the informant's sentencing hearing and using that transcript to expose the fact that the informant and a Deputy District Attorney had lied on the stand when they claimed he had received no sentence

4

reduction in exchange for testifying against appellant Baca.

2.  The prosecutor committed misconduct in failing to produce the transcript from the informant's sentencing hearing and presenting false testimony of another Deputy District Attorney as to the benefits that the informant had received for testifying against appellant Baca.

3.  Appellant's Sixth Amendment right to confront witnesses was violated when the trial court allowed police officers to testify that the victim had identified defendant as the shooter before he died. (ER1 pp. 8-9.)

Respondent filed an answer and appellant in turn filed a traverse to that answer.  On October 5, 2010, the District Court held an evidentiary hearing after which the parties submitted additional briefing.

On June 18, 2013, United States District Court Judge Margaret M. Morrow accepted the Magistrate Judge's Report and Recommendations and adopted those recommendations with the exception of Part V, which the court declined to adopt.  The petition for writ of habeas corpus was denied. (ER1 pp. 2-6.)

The District Court granted appellant's request to certify for appeal his claims that he had received

5

ineffective assistance of counsel and that the prosecutor committed misconduct by presenting false testimony.  The District Court found that "reasonable jurists could find its assessment of the claims debatable."  (Order Accepting Report and Recommendation of U.S. Magistrate Judge ER1 p.3.)

Appellant's notice of appeal was filed on June 27, 2013.

<u>JURISDICTION</u>

This court has jurisdiction for review for the denial of appellant's petition for writ of habeas corpus under 28 U.S.C. section 2253.

6

I

STATEMENT OF THE CASE

1.   California Procedural History.

In 1997 appellant was convicted by a Riverside County Superior Court jury of two counts of first-degree murder.  (Lodgment No. 1 at pp.1-2.)  Appellant appealed the conviction which was reversed by the California Court of Appeal, Fourth Appellate District, Division Two.  That decision found defense counsel was ineffective for asking about appellant's prior arrests, allowing the prosecutor to inquire about an arrest for the rape of a young girl. (ER1 pp. 7-8.)

Appellant was retried and again found guilty of two counts of first-degree murder and personal use of a firearm.  (ER1 p. 8,CT 289-290.)[1]  Appellant was sentenced to 70 years to life in state prison.  (CT 373, 384.)  On December 2, 2004, the Court of Appeal, Fourth Appellate District, Division Two affirmed the judgment.

 His petition for review in the California Supreme Court

---

[1] CT refers to the Clerk's Transcript on appeal in the California Court of Appeal which has been made part of the record below and transmitted to this court.

BACA.AOB

was denied on July 11, 2007.  (ER1 p. 8.)


2.    Federal Court Proceedings.

On May 16, 2008, appellant filed a petition for writ
of habeas corpus in the United States District Court for
the Central District of California.  On June 18, 2013,
the United States District Court denied the petition for
writ of habeas corpus.  The court certified for appeal
the issues herein raised by appellant, ineffective
assistance of counsel and prosecutorial misconduct.
Notice of appeal was filed on June 27, 2013. (ER1 pp.1,
5-6.)

8

BACA.AOB

II

STATEMENT OF FACTS[2]

This case involves the August 1995 murders of same-sex companions Jack Adair and John Mix.  Adair hired [Petitioner] as a live-in housekeeper and gardener a few months before the murders.  About two weeks before the murders, Valerie Millot, a close friend of Adair's, received a telephone call from Adair, saying that he wanted [Petitioner] to leave.  At Adair's request, Millot came over to Adair's house and asked [Petitioner] to leave, which he did.  In order to make sure that [Petitioner] did not come back, Adair and Millot packed [Petitioner's] belongings and put them in the driveway. While packing [Petitioner's] belongings, they found several items that contained information about [Petitioner].  Adair recorded the information just in case there were further problems.

Adair had an adopted son named Tom, whom he had taken in as a troubled teenager.  A short time after Adair and Millot ejected [Petitioner] from the house, Tom

---

[2] The Statement of Facts is taken as presented in the Report and Recommendation of the U.S. Magistrate Judge and adopted by the U.S. District Court on June 18, 2013.

BACA.AOB

called and confronted Millot.  Tom was angry and yelled
at Millot that this was none of her business, she should
not interfere, and [Petitioner] was a good guy.

Tom was apparently successful in getting Adair to
take [Petitioner] back.  Millot continued to see
[Petitioner] at Adair's house and [Petitioner] told his
other employer, a Chinese restaurant, that he could keep
working because his landlord had taken him back.

On the day of the murders, Millot picked up Adair's
companion Mix at the airport and brought him to Adair's
house.  During the drive, Mix mentioned that he was
afraid of [Petitioner].  Millot stayed at Adair's house
for a few hours, and when she finally left, Adair and Mix
were in good spirits and seemed to be getting along well.

Later that day, Adair called 911 to report that he
and Mix had been shot.  When asked by the 911 operator to
identify the assailant, Adair was unable to do so.

The sheriff's deputies who responded to the 911 call
found Mix lying on the floor dead, with a single gunshot
wound to his face.  The deputies also found a .38-caliber
revolver lying on the floor just inside the door about
six to eight feet away from Mix's body.  The police were
unable to obtain fingerprints from the gun.

10

BACA.AOB

As the deputies proceeded into the house, they found
Adair walking around holding a towel to his face, which
was bleeding profusely from two gunshot wounds.  The
deputies asked Adair to identify the assailant and he
responded in a garbled voice with something that sounded
like "Baca."  When the deputies asked for clarification,
Adair clearly repeated "Baca" several times and spelled
it.  Furthermore, after paramedics cleared Adair's mouth,
he directed the deputies to a piece of paper that
contained information about [Petitioner].

After Adair was taken to the hospital, a deputy was
assigned to pick up his adopted son Tom and take him to
the hospital.  While at the hospital, the deputy
overheard Tom speaking on a telephone trying to locate
[Petitioner].  When the deputy asked Tom to stop looking
for [Petitioner], Tom got upset and yelled at the deputy,
asking why he was forbidden from looking for the person
who shot his father.  Tom wanted to leave, but the deputy
would not allow that either.  After a second similar
confrontation, the deputy arrested Tom for interfering
with the investigation.

Adair died after a week in intensive care.  A few
days later, police officers found [Petitioner] loitering

in a park in Carson.  When the officers confronted

[Petitioner], he tried to hide his identification.  But

the officers retrieved his identification, discovered

that he had an outstanding warrant, and arrested him.

The police found Adair's car in the area surrounding the

park.

　　　[Petitioner] was charged with the murders of Adair

and Mix, and was initially convicted in August 1997.

However, [the state appellate court] reversed the

convictions based on ineffective assistance of counsel.

(*People v. Baca* (Sept. 28, 1999, E021093) [nonpub. opn].)

　　　On retrial, the prosecution's evidence was largely

the same as before, including the testimony of a

jailhouse informant, who described a murder-for-hire plot

involving Adair's adopted son Tom.  The informant claimed

that while he and [Petitioner] were housed together

awaiting trial, [Petitioner] mentioned that he was in

jail for murdering a rich doctor.  [Petitioner] said he

had been living and working at the doctor's house, in

addition to working at a Chinese restaurant.

[Petitioner] said that he began working for the doctor

after meeting the doctor's son, Tom, at the Chinese

restaurant.  [Petitioner] said that he quickly discovered

12

that the doctor was a homosexual and mentioned it to Tom, who said he knew and did not like it. Shortly after that, Tom told [Petitioner] that they could get rich by killing the doctor. The plan was for [Petitioner] to kill the doctor and his companion while they were together so that it would look like a love-triangle murder, then they could take the insurance proceeds. [Petitioner] said he shot them both in the head using a .38-caliber gun that was provided to him by Tom. When one of them did not die, [Petitioner] panicked and ran away, leaving the gun behind. [Petitioner] fled to his sister's home, called Tom, and told Tom that he had "fucked up." Tom was angry and told [Petitioner] to finish off the survivor, but [Petitioner] refused.

In support of the murder-for-hire theory, Millot testified that Adiar had always provided Tom with a vehicle, a job, and money. Nevertheless, a couple of months before the murders, Adair told Millot that he intended to disinherit Tom, leaving him with just enough for an education. Adair even read Millot the codicil changing his will.

Adair's brother testified that Adair was constantly bailing Tom out of financial trouble. But, a couple

13

months before the murders, Adair told his brother that he wanted to remove Tom from his will and insurance policies because their relationship has soured and Adair felt he was being used by Tom.

After Adair died, Tom became the beneficiary of $160,000 in insurance policies and investments. Tom also received most of the probate estate, including $300,000 in real estate and furniture that would have gone to Mix.

[Petitioner] testified on his own behalf, claiming that Tom asked him if he was interested in a job working at Adair's house. At Tom's request, Adair interviewed [Petitioner] and recorded some personal information before hiring him. For the first couple of months, [Petitioner] was alone in the house most of the time because Adair and Mix were in the Los Angeles area. During this time, Tom visited regularly, and [Petitioner] and Tom frequently talked on the telephone.

[Petitioner] admitted that Adair and Millot ejected him from the house a few weeks before the murders. At that time, [Petitioner] called Tom, who said [Petitioner] should call the police to see if he could get back in. The police talked to Adair, but ultimately told [Petitioner] that it would be best if he left.

BACA.AOB

[Petitioner] did not mind leaving because he was unhappy with the situation, so he went to Tom's house and asked Tom to take him to his grandmother's house in the Los Angles area.  Tom agreed to do so, dropped [Petitioner] off at the Chinese restaurant for a last day of work, and went to get [Petitioner's] belongings from Adair.  After work, Tom said that Adair wanted to talk to [Petitioner]. Adair apologized for throwing [Petitioner] out and took him back.

The day before the murders, Adair asked [Petitioner] to drive him to pick up Mix at the airport the next day and [Petitioner] agreed to do so.  However, [Petitioner] went out that night with a girlfriend, had too much to drink, and did not make it home the next day.  When [Petitioner] called Adair to say that he was unable to drive him to the airport, Adair was disappointed.

Later that day, Tom called [Petitioner], picked him up, and took him to Adair's house.  Upon entering the house, [Petitioner] saw that Adair appeared to be showing [Petitioner's] room to a couple of women as if he intended to rent it to them.  [Petitioner] thought Adair was upset about the airport and was going to eject him from the house again.  [Petitioner] did not want

15

any[]more headaches and was not making much money, so he began packing to leave.

While [Petitioner] was packing, Tom interrupted and asked [Petitioner] to go with him to an auto parts store. [Petitioner] agreed to go. When Tom returned [Petitioner] to Adair's house, Adair and Mix were the only ones there. Adair asked [Petitioner] if he was planning to leave and he said yes. Because Mix was there to pick up the car and drive it to Los Angeles, [Petitioner] asked Mix to drive him to his grandmother's house in the Los Angeles area. Mix agreed to do so, so [Petitioner] got the car keys and began loading his belongings into the car. While [Petitioner] was loading the car, Adair and Mix went into the bedroom and began arguing. After waiting 20 minutes for them to finish, [Petitioner] decided to take the car himself, which he admitted was a bad idea.

[Petitioner] drove to Carson and stayed with some friends in that area. [Petitioner] abandoned the car nearby with the keys in the ignition. [Petitioner] claimed that when he was confronted by the police a few days later, he tried to hide his identification because

BACA.AOB

he thought he would get in trouble for stealing Adair's car.

[Petitioner] claimed that he never met the jailhouse informant and had never seen the gun before. [Petitioner] denied talking with Tom about Adair's money, but admitted that Tom mentioned that Adair was well-off. [Petitioner] denied conspiring with Tom to kill Adair or Mix, denied having any communications with Tom after the murders, and denied getting any financial benefit from their deaths. (ER1 pp.9-16.)

BACA.AOB

ARGUMENT I

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL
WHEN COUNSEL FAILED TO OBTAIN AND USE THE TRANSCRIPT OF
THE INFORMANT'S SENTENCING HEARING TO IMPEACH THAT
INFORMANT AND A DEPUTY DISTRICT ATTORNEY WHO TESTIFIED IN
SUPPORT OF THE INFORMANT THAT NO MATERIAL BENEFIT HAD
BEEN RECEVIED BY THE INFORMANT IN EXCHANGE FOR HIS
TESTIMONY AGAINST APPELLANT BACA.

A.   Factual Background.

        The jailhouse informant, Daniel Melendez, testified
he had been housed with appellant in August of 1995.  It
was during that time Melendez and Baca allegedly
discussed the details of the shooting of Jack Adair and
John Mix on August 6, 1995.  Appellant at that time had
been charged with the murder of both men and was awaiting
trial on two counts of first-degree murder.

        Melendez himself was in custody facing charges of
homicide.  This offense was later reduced to one count of
voluntary manslaughter based upon his cooperation against
co-defendants in that case.  At the time of Melendez's
testimony in appellant's second trial he had been paroled
from state prison.

        Melendez provided extremely damaging testimony in
appellant's case, including allegations that appellant
had admitted to him how the murders had been planned and
committed.  Appellant had supposedly acknowledged his

18

responsibility for the death of both men.  Appellant
denied that any such statements had ever been made to
Melendez. (ER1 pp. 22-23, ER2 pp.9-13.)

Melendez testified that he had come forward with the
information with no intention of requesting any benefit
from the District Attorney.  He repeatedly stated he did
not ask for nor did he receive any benefit for his
testimony.

Deputy District Attorney Robert Spira testified that
he was the prosecuting attorney in the Melendez homicide
case.  Spira testified Melendez pled guilty to voluntary
manslaughter with a firearm enhancement and was to
receive a sentence of 14 years in state prison along with
a favorable housing recommendation.  Spira testified that
Melendez did not seek nor did he receive any benefit for
testifying in the Baca trial.  Spira insisted Melendez's
plea deal was not contingent on his testimony against
Baca.  He testified the reduction in Melendez's agreed-
upon 14-year term was the result of misconceptions over
good-time credits.

Deputy District Attorney Spira claimed the trial
court ultimately selected a term of 11 years for Melendez
in an effort to approximate the same seven years of

BACA.AOB

actual incarceration the original 14-year sentence would have required, given 50% good conduct credits.  Spira specifically testified the reduction from 14 years to 11 years had nothing to do with Melendez's testimony in the Baca case.  He also stated Melendez did not request any sentence reduction in exchange for his testimony against Baca. (ER1 pp. 22-23, ER2 pp. 9-15.)

Melendez was sentenced on February 26, 1998.  A review of the transcript of those proceedings makes it abundantly clear that Melendez received an additional three-year reduction as a result of his, (1) specifically requesting reconsideration of his sentence in light of his testimony in appellant Baca's case and (2) the District Attorney's statement to the court that it would defer to any decision of the court to reduce Melendez's sentence and would not appeal any such decision by the court.  (ER2 pp. 22-23.)

B.   Appellant's Argument in the District Court.

The California Court of Appeal acknowledged that Mr. Melendez's testimony was of paramount importance to the People's case.  The Court also found the testimony of Deputy District Attorney Spira to be "highly misleading". The Court of Appeal opined his testimony sent a "single,

unwavering, blatantly false message to the jury." The
Court of Appeal concluded that both Melendez and Deputy
District Attorney Spira had testified untruthfully. The
Court of Appeal also found that trial counsel's failure
to examine the informant's sentencing transcript and to
use that transcript to impeach both Melendez and Spira
fell well below an objective standard of reasonableness
under prevailing professional norms. The Court of Appeal
concluded Melendez was a key witness whose credibility
was in issue and that any reasonably competent attorney
should have been familiar with the facts surrounding the
sentencing in the Melendez case and use that information
to challenge the false testimony presented by Melendez
and Deputy District Attorney Spira. (ER2 pp. 22-23, 25.)

C.    Decision of the District Court.

     The District Court agreed with the California Court
of Appeal to the extent that counsel's failure to obtain
the transcript and cross-examine Melendez and Spira with
that transcript was unreasonable. The District Court
found that this failure to present this evidence to the
jury constituted conduct falling below the standard
required of reasonably competent defense counsel. (ER1
p. 23.) The District Court found that both Melendez and

Deputy District Attorney Spira had testified falsely before the jury.  (Report and Recommendation p. 16.)  The District Court found trial counsel's conduct fell below the standard of *Strickland v. Washington* (1984) 466 U.S. 668.  (ER1 p. 23.)

Despite the District Court's specific finding that trial counsel was ineffective, the court concluded that prejudice was not established despite the court's belief that it would find prejudice if a *de novo* review of appellant's case was undertaken.  The District Court noted that the informant's testimony was the "backbone" of the prosecutor's murder-for-hire theory.  The District Court noted and concurred with the state appellate court's finding that without Melendez, the prosecution had presented no direct evidence of appellant's motive for the murder and/or that the offense was deliberate and premidated, an element of a first-degree murder finding. (ER1 pp. 24-25.)

The District Court, nonetheless, denied the petition because it could not conclude that the State court's finding that counsel's error was not prejudicial was objectively unreasonable.  (*Mitchell v. Esparza* (2003)

540 U.S. 12, 18.)[3]  The District Court noted that the term "objectively unreasonable" was recently defined in the context of State court findings of prejudice stemming from ineffective assistance of counsel.  (*Harrington v. Richter* (2011) 131 S.Ct. 770, 786.)  This and other cases held that a state's court finding there was no prejudice may not be overturned by a federal court unless the federal court concludes that no fair-minded jurist would agree with the State court's decision.  (*Richter* 131 S.Ct. at pp. 786, 792.)

The District Court stated that under that standard, the California Court of Appeal's conclusions, despite the District Court's misgivings, were such that it could not be concluded the appellate court's conclusion was so lacking in justification that there is no possibility that a fair-minded jurist would disagree.  (ER1 pp.28-29.)

D.  Discussion.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires this court defer to the last

_____

[3] The State court had called the question of prejudice a "close question."  (ER2 p. 19.)

BACA.AOB

reasoned State court decision.  28 U.S.C. section 2254
provides that a federal court may grant a state court
prisoner's habeas petition with respect to a claim that
was "adjudicated on the merits in State court
proceedings" only if the State court's adjudication: (1)
resulted in a decision that was contrary to, or involved
an unreasonable application of clearly established
federal law, as determined by the Supreme Court of the
United States; or (2) resulted in a decision that was
based on an unreasonable determination of the facts in
light of the evidence presented in the State court
proceedings.  (28 U.S.C. section 2254(d).)

A State court decision is contrary to federal law
under section 2254(d)(1) if it applies a rule that
contradicts the governing laws set forth in Supreme Court
cases or if it "confronts a set of facts that are
materially indistinguishable from a decision of [the
Supreme Court] and nevertheless arrives at a result
different from [Supreme Court] precedent."  (*Terry
Williams v. Taylor* (2000) 529 U.S. 362, 405-406.)

A State court decision involves an unreasonable
application of federal law under section 2254(d)(1) if
the State court identified the correct governing legal

24

rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case or if it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. (*Id.* at p. 407.)

The Supreme Court need not have applied a specific legal rule to a closely analogous fact pattern for the State court's decision to constitute an unreasonable application of clearly established federal law because even a general standard may be applied in an unreasonable manner. (*Panetti v. Quarterman* (2007) 551 U.S. 930, 953.) A State court decision involves an unreasonable application of clearly established federal law, however, only if the State court's decision was "objectively unreasonable" and not merely incorrect. (*Terry Williams v. Taylor*, *supra,* 529 U.S. at pp. 409-410.)

Here, both the State Court of Appeal and the District Court concluded appellant's trial counsel was ineffective because he failed to investigate or review the transcript of the informant's sentencing hearing and use that transcript to cross-examine and impeach both the

informant and Deputy District Attorney Spira.  While the State court decision must be granted deference and lattitude that are not in operation when the case involves review under the *Strickland* standard itself, it appears the District Court would, after a *de novo* review, part company with the State Court of Appeal.[4]  The question becomes whether the State court's application of the *Strickland* standards was unreasonable on the facts of this case.  (*Richter*, *supra*, 131 S.Ct. at p. 786.)

Under section 2254(d), this court must determine what arguments or theories supported the State court's decision and then must ask whether it is possible that fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.  (*Ibid*.)  Appellant must also show that the appellate decision being analyzed here was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.  (*Id*. at pp.

---

[4] It is ironic that had the State appellate court found on the facts no ineffective assistance of counsel, the District Court could conclude that court's determination of the facts was "unreasonable" under section 2254(d)(2). This would then allow a *de novo* prejudice assessment. (See *Detrich v. Ryan* (9th Cir. 2012) 677 F.3d 958.)

786-787.)  The state appellate court's conclusion that prejudice did not exist was unreasonable and, based upon the undisputed facts in this case, is one in which no fair-minded jurist could agree.

The State appellate court acknowledged that without Melendez's testimony the prosecution had presented no direct evidence as to appellant's motive for the crime or how the crime occurred.  More importantly, but not discussed in any detail by the appellate court, was their recognition that Melendez provided the sole testimony as to deliberation and premeditation, an element necessary to elevate the offense from second-degree murder to first-degree murder.  (ER1 pp. 26-27.)

As correctly noted by the District Court, exposing the fact Melendez was lying would have "undermined his testimony" and, as a result, would seriously undermine the prosecution's case.  The District Court correctly noted that it would have exposed the fact that Deputy District Attorney Spira had lied when, in an effort to bolster Melendez's testimony, he testified Melendez's sentence had not been reduced in exchange for his testimony against appellant.  The District Court noted that Spira not only testified the informant had not

27

requested or received any benefits but he also created a story to explain away the three-year reduction. (ER1 p. 25.) The District Court correctly noted that exposing this fact, in combination with the fact that the informant himself had lied, would have caused reasonable jurors to question the prosecution's case.

The State Court of Appeal placed some emphasis on the details provided by Melendez suggesting that he must have been telling the truth about Baca's confession. However, any faith in Melendez was based on details that could have readily been obtained from other sources. This is belied by the undisputed fact Melendez lied to the jury about the benefits he received.

The decision of the Court of Appeal acknowledged that prejudice was a "close question". (ER2 p. 19.) However, the State court concluded there was not a reasonable possibility of a different outcome. The court found it unlikely a jury would find that a witness who had a three-year sentence reduction was necessarily uncredible. The State court gave some credence to details recited by the informant Melendez that only could have come from an insider, such as the nature of the weapon and alleged references to a Chinese restaurant. However, the State

BACA.AOB

Appellate Court overlooked the fact that Melendez had
testified appellant told him these details on several
occassions over the course of time they were together in
the same cell, both awaiting trial on murder charges.
However, the evidence established that appellant and
Melendez were housed together for only three days.  A
reasonable juror would reject the testimony had they
known that Melendez had lied about important issues.

The State appellate court's conclusion on prejudice
was incorrect and incomplete.  It was incomplete to the
extent the court did not discuss the testimony's impact
on the jury's finding the murders were deliberate and
premeditated.  An examination of whether prejudice
existed is not exclusively limited to whether a jury
would have acquitted the defendant.  Rather, the issue
becomes whether even one juror would have changed his or
her vote having been made aware that both Melendez and a
Deputy District Attorney had looked them in the eye and
lied.  (See *Cone v. Bell* (2009) 129 S.Ct. 1769, 1786.)
[Noting that the focus should be on whether one juror
would have changed his or her mind.]  Another problem
with the State court's decision is that there was no

BACA.AOB

discussion of the impact of Melendez's testimony on the elements establishing premediation and deliberation.

The question is not whether appellant would have been acquitted by a jury of 12 people, but whether that same jury or even one juror would not have found the offense to be premeditated and deliberate. The State Court of Appeal's finding that the failure of counsel to challenge the two witnesses was not prejudicial was objectively unreasonble. It strains credulity to find that trial counsel's failure to prepare to challenge the knowing presentation of false testimomy through not only a jailhouse informant but a Deputy District Attorney was not prejudicial even under the strict standards of the AEDPA and *Richter*.

In this case the harmless error analysis by the State court was incomplete and failed to address the above-noted important considerations. While the decision of the State court is entitled to some deference, the shortcomings in the State court's analysis render that deference unreasonable. As noted, the lack of discussion as to whether a single juror's decision would have been influenced by an awareness of the false testimony was notable. Additionally lacking was any discussion as to

BACA.AOB

the impact of counsel's errors on the jury's findings as to premediation and determination, crucial elements of the first-degree murder finding.

It is not unreasonable to suspect that one, if not all jurors, would have questioned the veracity of Melendez's testimony, possibly in its entirety, had they been aware Melendez lied about benefits provided and that this lie was compounded by the testimony of a Deputy District Attorney.  The State court's finding in this case was so lacking in justification that there existed error well understood and comprehended and on these facts there could not exist fair-minded disagreement.  The conclusion there was no prejudice warranting a reversal of appellant's conviction was objectly unreasonable.

31

ARGUMENT II

THE PROSECUTION COMMITTED MISCONDUCT BY PRESENTING FALSE
EVIDENCE THAT THE INFORMANT HAD NEITHER ASKED FOR NOR
RECEIVED ANY BENEFIT FOR TESTIFYING AGAINST APPELLANT.

A.   Introduction.

The District Court in its findings concluded the

District Attorney had used false testimony to obtain

appellant's convictions.  However, the District Court

deferred to the State Court of Appeal's finding that

there was no prejudice.  (ER1 p. 31.)  It was not

disputed that Deputy District Attorney Spira provided

false testimony to the jury in support of the informant

and this was so found by the State court as well as the

District Court.

B.   District Court's Findings and Recommendations.

The District Court agreed with the California Court

of Appeal's finding that Melendez and Deputy District

Attorney Spira provided false testimony.  The District

Court found that while there was no evidence on the

record to suggest Deputy District Attorney Vinegrad knew

Melendez was lying, he was nonetheless responsible for

the false testimony presented by Deputy District Attorney

Spira.  (ER1 pp. 32-33.)

32

The District Court imputed knowledge of Spira's false testimony to Vinegrad under well established principles. (*Giglio v. United States* (1972) 405 U.S. 150, 154-155.) However, the District Court concluded that there was not a reasonable likelihood that Spira's false testimony materialy affected the jury's verdict. (ER1 p. 35.)

C.   Discussion.

A conviction obtained by the knowing use of false evidence or perjured testimony is fundamentally unfair and violates a defendant's constitutional rights. (*United States v. Augers* (1976) 427 U.S. 97, 103; *Napue v. Illinois* (1959) 360 U.S. 264, 269.) A conviction obtained through the use of false evidence known to be such by representatives of the State must fall under the Fourteenth Amendment. (*Napue* at p. 269.)

While appellant would question whether Deputy District Attorney Vinegrad was aware that Melendez was testifying untruthfully when he stated he had neither sought nor received any benefit for testifying against appellant, the presentation of false testimony through Deputy District Attorney Spira weighed heavily on appellant's conviction. The record shows the testimony

33

was actually false and that the prosecuting attorney knew or *should have known* that the testimony was actually false. Deputy District Attorney Vinegrad tried both cases and it is hard to imagine he was ignorant of the deal made with the informant. The testimony of Spira was clearly material as it served to bolster the informant's false testimony that he had neither asked for nor received any benefit for his testimony. To assess materiality under *Napue* it must be determined whether there is any reasonable likelihood the false testimony could have affected the judgment of the jury. If so, the convcition must be set aside. (*United States v. Augers, supra*, at p. 103.)

A prosecutor plays an important and special role in the search for truth in criminal cases. (*Stricklar v. Green* (1999) 527 U.S. 263, 281.) As this Circuit has noted in *Northern Mariana Islands v. Mendiola* (9th Cir. 1992) 976 F.2d 975, 486, overrulled on other gounds in *George v. Camacho* (9th Cir. 1997) 119 F.3d 1393:

> The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily the win, but to do justice. It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial.

BACA.AOB

It has been held that if it is established the government knowingly permitted the introduction of false testimony reversal is virtually automatic. (*United States v. Wallach* (2d Cir. 1991) 935 F.2d 445, 456.) A *Napue* violation is material if there is any reasonable likelihood that the false testimony could have affected the jury's decision. (*Libberton v. Ryan* (9th Cir. 2009) 583 F.3d 1147, 1164, *cert. denied*, 130 S.Ct. 3412 (2010).)

The District Court correctly concluded that the prosecutor's office is a single entity and, as such, a promise to a cooperating witness by one prosecutor in that office is attributable to another prosecutor in the same office even though the other prosecutor did not know about the promise. (*Giglio v. United States* (1972) 405 U.S. 150, 154-155.) The district court therefore correctly concluded that Spira's false testimony was imputed to Vinegrad, appellant's prosecutor.

Appellant believes that not only was Mr. Spira's testimony material, but that there also is a reasonable likelihood that it affected the jury's verdict. (*Jackson v. Brown* (9th Cir. 2008) 513 F.3d 1057, 1075.) The California Court of Appeal's "prejudice analysis"

35

consisted of three lines and no real analysis. The State court's opinon completely overlooks the potential impact upon jurors when they are advised that not only was the informant knowingly presenting false testimony to them but so also was a Deputy District Attorney. Spira was effectively vouching for Melendez by testifying that Melendez provided the testimony with no benefit expected and was acting only as a model citizen. This strains credulity. Again, the question becomes whether even a single juror would be so offended by the prosecution's conduct that a rejection of Melendez's testimony in its entirety becomes a real consideration.

Both the District Court and the State appellate court concluded Melendez and Spira were key prosecution witnesses. Virtually all of the other evidence against appellant was circumstancial. It was Melendez who provided the only testimony supporting the allegation of premeditation and deliberation. The false testimony by Deputy District Attorney Spira was material because it related to the main witness in the prosecution's case. To summarily reject the probability that one or more jurors would not be greatly offended by the prosecutor's false testimony is unreasonable on its face. Had the

BACA.AOB

jurors been apprised of the false testimony, serious questions would have been raised about other apsects of the prosecution's case, in particular the testimony of Melendez relating to premeditation and deliberation.

Appellant is entitled to relief. More importantly, he is entitled to a fair trial.

37

CONCLUSION

For the foregoing reasons it is requested that this court grant appellant's petition for writ of habeas corpus, reverse his state court conviction and grant any other relief that is just and appropriate.

Respectfully submitted,

/s/PATRICK J. HENNESSEY, Jr.
PATRICK J. HENNESSEY, JR.
Attorney for Defendant

38

STATEMENT OF RELATED CASES CIRCUIT RULE 28-2.6

There are, to counsel's knowledge, no related cases.

CERTIFICATION OF WORD COUNT

*People v. Baca*

I, Patrick J. Hennessy, Jr., hereby certify that according to the computer program used to prepare this document, Appellant's Opening Brief contains 6,241 words.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 4th of December, 2013, in San Diego, California.

/s/PATRICK J. HENNESSEY, Jr.
PATRICK J. HENNESSEY, JR.
Attorney for Defendant

40

CERTIFICATE SERVICE BY MAIL

    I, the undersigned, declare that:  I am over the age of eighteen years and not a party to the action; I am employed in the County of San Diego, California, within which county the subject mailing occurred; my business address is 2356 Moore Street, Suite 201, San Diego, California; I am familiar with this firm's practice for collection and processing correspondence for mailing with the United States Postal Service pursuant to which practice all correspondence will be deposited with the United States Postal Service the same day in the ordinary course of business.  I served the following document(s):

Appellant's Opening Brief

by placing a copy thereof for each addressee named hereafter, addressed to each such addressee, in a separate envelope, postage prepaid, sealed and deposited at this firm's mailstation on  December 4, 2013 .

Office of Attorney General
110 W. A St, Suite 1100
P.O. Box 85266
San Diego, CA 92186
On file for ECF service)

Johnny Baca T-77207
A-2-145
P.O. Box 409020
Ione, CA 95640

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    Executed on  December 4, 2013.

        /s/PATRICK J. HENNESSEY, Jr.
        PATRICK J. HENNESSEY, JR.

BACA.AOB